# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**ARNETT COBB,**
        Petitioner,

v.                                               Civil Action No. 5:10cv66
                                                    (Judge Stamp)

**WARDEN, FCI GILMER,**
        Respondent.

## REPORT AND RECOMMENDATION

On June 14, 2010, the *pro se* petitioner, Arnett Cobb, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. The petitioner is an inmate at FCI Gilmer, which is located in Glenville, West Virginia. In the petition, the petitioner challenges a decision of the United States Parole Commission (USPC). The undersigned conducted a preliminary review on July 21, 2010, and determined that summary dismissal was not appropriate at that time. Accordingly, a show cause order was entered. On September 30, 2010, the respondent filed a Motion to Dismiss, or in the alternative, Motion for Summary Judgment. On October 1, 2010, a Roseboro Notice was issued and on December 2, 2010 the petitioner filed Memorandum in Support of Motion for Evidentiary Hearing. This matter, before the undersigned for a Report and Recommendation pursuant to LR PL P 2, et seq., is ripe for review.

## I. FACTUAL AND PROCEDURAL HISTORY

On January 18, 1980, the Superior Court of the District of Columbia sentenced the petitioner to 9 ½ years for burglary, destruction of property, and drug possession. (Doc. 29-1). On February 28, 1984, the D.C. Superior Court sentenced the petitioner to 35 years, consecutive to the 1980 sentence, for assault with intent to rape, robbery, and unauthorized use of a vehicle. (Doc. 25-4). The

aggregated total term of the 1980 and 1984 sentences was 44 ½ years. The D.C. Board of Parole initially denied parole on June 1, 1992 but granted it by order dated October 20, 1992. (Doc. 29-6).

On September 7, 1993, the petitioner was arrested and charged with rape while armed, kidnaping and sodomy. (Doc. 25-8). The D.C. Parole Board issued a warrant charging the petitioner with violating his parole by committing the new offenses and failing to report his arrest. (Doc. 25-9). The warrant was placed as a detainer. (Doc. 25-10). Subsequently, the petitioner was convicted of rape and unauthorized use of a vehicle for the 1993 incident. On September 13, 1994, the Superior Court of the District of Columbia sentenced the petitioner to 12-36 years. (Doc. 25-11).

The petitioner was then transferred to the jurisdiction of the USPC pursuant to the National Capital Revitalization and Self-Government Improvement Act of 1997.[1] At the USPC's request, a psychological evaluation was performed on the petitioner on April 2, 2001. The report noted: "The absence of regret and his refusal to accept responsibility for his behavior suggest that his risk too commit another sexual offense may be higher than what test scores present." (Doc. 25-13, p. 3). On April 16, 2001, the USPC conducted a review hearing for the petitioner, and by notice of action dated June 7, 2001, denied parole and continued him for rehearing after 36 months. (Doc. 25-14).

On August 31, 2004, the USPC conducted a combined parole hearing on the 1994 sentence and a revocation hearing regarding the detainer for the unexpired portion of the sentences imposed on January 18, 1980, and February 28, 1984. The pending violation consisted of violating the law

---

[1]On August 5, 1998, the Commission obtained jurisdiction of D.C. Code offenders to grant and deny parole through the National Capital Revitalization and Self-Government Improvement Act of 1997, Pub. L. No. 105-33, §11231(a)(1), 111 Stat. 712, 745, D.C. Code §24-1231(a)("Revitalization Act."). See also Franklin v. District of Columbia, 163 F.3d 625, 632 (D.C. Cir.1998). Effective August 5, 2000, the Commission was given the responsibility of supervising parolees and revoking parole. §11231(a)(2) of the Act codified at D.C. Code §24-131(a)(2).

by committing the 1993 offense. The USPC revoked parole on the 1980 sentence and denied parole on the 1994 sentence, continuing the matter for another 36 months. (Doc. 25-15).

Following a July 24, 2007 hearing, the USPC set a presumptive parole date of May 7, 2010. (Doc. 25-16). On December 18, 2008, the petitioner was admitted to the residential Sex Offender Treatment Program[2] at the Federal Medical Center ("FMC") Devens but voluntarily withdrew from the program on March 25, 2009, after only 32 days. (Doc.25-17). When the USPC learned that the petitioner voluntarily withdrew himself from the program at FMC Devon, it issued a Notice of Action on January 4, 2010 to reopen the case for a Special Reconsideration Hearing, pursuant to 2.28(f) new adverse information. (Doc. 25-19, p. 1).

Following a January 14, 2010 hearing, the USPC rescinded the May 7, 2010 presumptive parole date. The USPC reevaluated the petitioner's case under the 1987 guidelines of the D.C. Board of Parole. Although the petitioner's guideline score of 0 ordinarily would have indicated parole should have been granted, the USPC departed upwards on the basis that there was a "reasonable probability the [the petitioner] would not obey the law if released and [his] release would endanger the public safety. (Doc. 25-19, p. 5). In addition, the USPC made a specific finding that the petitioner must participate in and complete the Bureau of Prisons Sex Offender Treatment Program in order to reduce the risk that he poses to the community. Id.

---

[2]Although the respondent asserts that the USPC conditioned the petitioner's presumptive release date of May 7, 2010, on his completion of a sex-offender health program, the Notice of Action contains no such provision. (Doc. 25-16). However, the Hearing Summary from January 14, 2010, indicates that it was clear to the examiner from reading the previous hearing summary, that the Commission granted the subject the May, 2010 presumptive parole date so that he could enter and participate in the Sex Offender Treatment Program. Moreover, there was also information in the Evaluation Portion of the previous summary to suggest that the petitioner actually was requesting to go to that program at Butner at the time. (Doc. 29-18, p. 4).

In or around April 2010, the petitioner forwarded a letter to the Inspector General alleging that his parole eligibility should have been considered under the Sellmon[3] rule and had not been. Finding no ground for warranting investigation, the Inspector General's office forwarded the letter to the USPC. (Doc. 25-21). By letter dated May 14, 2010, the USPC responded to the petitioner's accusation by explaining that the 1987 guidelines had, in fact, been applied to his case. (Doc. 25-22).

## II. CONTENTIONS OD THE PARTIES

The petitioner argues that the USPC committed an *ex post facto* violation by applying the 2000 parole rules to his 1994 sentence instead of the 1987 rules. The petitioner also argues that the USPC violated his right to due process and equal protection specifically arguing that were he Caucasian, the outcome of his parole hearings would have been substantially different. The petitioner also appears to make a claim that the decision of the USPC amounts to cruel and unusual punishment. For relief, the petitioner seeks immediate release on parole and additional unspecified "proper remedy." (Doc. 1).

The respondent argues that the petitioner's claims against the BOP should be dismissed because he has already received consideration under the 1987 guidelines. In addition, the respondent argues that judicial review of the USPC's decision is limited , and the USPC's reasons comply with the statute and show "some evidence" for the parole denial. The respondent also argues that the petitioner has not made a colorable statutory or constitutional claim that the USPC's parole

---

[3]In Sellmon v. Reilly, 551 F.Supp.2d 66, the United States District Court for the District of Columbia determined that a prima facie case of an *ex post facto* violation resulted from the retro-application of the USPC parole regime rather than the D.C. parole regime. However, only an inmate who demonstrates that the practical effect of the new policies was to substantially increase the risk he would serve lengthier terms of incarceration is entitled to relief on his *ex post facto* claim.

4

decisions in his case arose out of, or constituted racially motivated discrimination.  Finally, the respondent argues that USPC denial of his parole application does not violate the Eighth Amendment prohibition against cruel and unusual punishment.

In his "reply" to the respondent's Motion to Dismiss or for Summary Judgment, the petitioner  expounds on his ex post facto claim.  In addition, the petitioner argues that the information that he withdrew from the Residential Sex Offender Treatment Program was not significant and fairness dictates that the USPC should not have used it for purposes of revoking or retarding his parole date.   Finally, the petitioner  argues there was no adequate justification for departure from the 1987 guidelines because he meets the Parole Suitability Requirements set forth in D.C. Code § 24-404, and the USPC assessment of risk is not warranted given his age, and the conditions that would attach to his parole, including a high level of supervision, with GPS monitoring systems and periodic polygraph examinations.

### III.  STANDARD OF REVIEW

**A.  Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)).  In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993); see also Martin, 980 F.2d at 952.
The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim

showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Conley, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. (citations omitted), to one that is "plausible on its face," id. at 570, rather than merely "conceivable." Id. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I.DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir.2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir.2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

**B. Summary Judgment**

The Supreme Court has recognized the appropriateness of Rule 56 summary judgment

6

motions in habeas cases. See Blackledge v. Allison, 431 U.S. 63, 80 91977). So too, has the Fourth Circuit Court of Appeals. Maynard v. Dixon, 943 F.2d 407 (4th Cir. 1991). Pursuant to Rule 56c of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Motions for summary judgment impose a difficult standard on the moving party; for it must be obvious that no rational trier of fact could find for the nonmoving party. Miller v. Federal Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). However, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242-252 (1986). To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson, 477 U.S. at 248. It is well recognized that any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Industrial Co. V. Zenith Radio Corp., 475 U.S. 574, 587-88 1986).

## IV.  DISCUSSION

In 1997, Congress overhauled the District of Columbia's government, including the parole system through the National Capital Revitalization and Self-Government Improvement Act of 1997,

7

Pub. L. No. 105-33, §11231(a)(1), 111 Stat. 712, 745, D.C. Code §24-1231(a)("Revitalization Act."). Effective August 5, 1998, the D.C. Board was abolished, and its jurisdiction over parole decisions for D.C.Code violators was transferred to the USPC. Upon assuming the D.C. Board's jurisdiction, the USPC began a process of revising the regulations for determining D.C.Code offenders' suitability for parole. See Sellmon, 551 F.Supp.2d at 72-73 (discussing revisions). The revisions were codified at 28 C.F.R. §§ 2.70-2.107 in 2000 (2000 Regulations). The 2000 Regulations specify that they are applicable to a D.C.Code offender, such as the petitioner, whose first parole hearing would occur after August 5, 1998. See 28 C.F.R. § 2.80(a)(5). The changes incorporated in the 2000 Regulations are broad and arguably could pose a significant risk of a longer period of incarceration than under the earlier 1987 Regulations.

## A. 1987 Regulations

"The 1987 Regulations were adopted to 'structure the exercise of the paroling authority's discretion' and to promote 'increased consistency in parole release decisions and enhanced accountability of the Board' by making '**explicit** those factors that will be considered in each case." Sellmon at 554, *quoting* Report on the Development of the Paroling Policy Guidelines for the District of Columbia Board of Parole (emphasis in original). Under the 1987 Regulations, after serving his minimum sentence, a D.C.Code offender became eligible for parole.[4] The D.C. Parole Board would then determine the prisoner's suitability for parole by calculating a total point score (TPS) which ranges from 1 to 5. Based on the TPS score, the 1987 regulations lead to one of two

---

[4] "[T]he justice or judge of the court imposing [a felony' sentence shall sentence the person for a maximum period not exceeding the maximum fixed by law, and for a minimum period not exceeding one-third of the maximum sentence imposed, and any person so convicted and sentenced may be released on parole...at any time after having served the minimum sentence. " D.C. Code § 24-403 (2001).

outcomes: "parole shall be granted" or "parole shall be denied. D.C. Mun. Regs. Tit. 28, §§ 204.19-.22 (1987) (repealed 2000). At an initial parole hearing, a prisoner with 0, 1, or 2 points "shall be" granted parole with varying degrees of supervision. Id. at § 204.19. For a prisoner with 3, 4, or 5 points, "[p]arole shall be denied at initial hearing and hearing rescheduled." Id. However, regardless of whether the 1987 Regulations indicated that a prisoner's parole should be granted or denied, the D.C. Board retained the discretion to reach a different decision if merited by "unusual circumstances." Id. at § 204.22.

## B. The 2000 Regulations

Between 1998 and 2000, the USPC drafted new parole regulations and guidelines that it applied to any offender who received an initial parole hearing after August 5, 1998. See Sellmon 551 F.Supp.2d at 73. The USPC justified its revisions by explaining that its research demonstrated that "t]he point score system used by the D.C. Board of Parole ha[d] resulted in a high rate of upward departures from the guidelines based upon factors that should be included in the guidelines...." 63 Fed.Reg. 17771, 17772 (Apr. 10, 1998).

The 2000 Regulations establish the process the USPC follows to calculate the number of months a prisoner should serve in custody before he is suitable for parole. This multi-step process results in what is called the Total Guidelines Range, which is the "amount of time [a prisoner] may expect to serve with continued good conduct and ordinary program achievement." 65 Fed. Reg. 0663, 70664 (November 27, 2000). Until the prisoner has served a period of time equal to the bottom of his total guideline range, he is presumed to be unsuitable for parole. See 28 C.F.R. §§ 2.80(h), (I), & (f). Like the 1987 Regulations, the 2000 Regulations permit the USPC to deny parole to a prisoner who is presumptively eligible under "unusual circumstances." The 2000 Regulations

9

provide examples of "unusual circumstances" but do not limit the discretion of the USPC to depart on any basis that it classified as "unusual" except that it cannot have been "fully taken into account in the guidelines." 28 C.F.R. § 2.80(n).

## V. ANALYSIS

As previously noted, the petitioner alleges that the USPC violated his rights under the *Ex Post Facto* Clause of the United States Constitution by using the 2000 Regulations rather than the 1987 Regulations. In addition, the petitioner also throws out the phrase "bill of attainder." (Doc. 1, p. 2).

1. Bill of Attainder

"Article I, § 9 of the United States Constitution provides that '[n]o Bill of Attainder or ex post facto law shall be passed.'" In re DNA Ex Post Facto Issues, 561 F.3d 294 (4th Cir. 2009). A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." Nixon v. Administrator of Gen. Servs., 433 U.S. 425, 468 (1977).

Liberally construed, the petitioner asserts that the Revitalization Act is a Bill of Attainder. However, the Revitalization Act affects an entire class of persons, D.C. Code offenders, not an "identifiable individual." See Bledsoe v. United States, 384 F.3d 1232 (10th Cir. 2004). In addition, the Act does not inflict any punishment upon the petitioner "beyond maintaining his original sentence." Webb v. Williamson, 2007 WL 1450397 *3 (M.D.Pa. May 16, 2007). Thus, the Revitalization Act is not a Bill of Attainder.

2. Ex Post Facto Clause

The Ex Post Facto Clause "forbids the Congress and the States to enact any law which

provide examples of "unusual circumstances" but do not limit the discretion of the USPC to depart on any basis that it classified as "unusual" except that it cannot have been "fully taken into account in the guidelines." 28 C.F.R. § 2.80(n).

## V. ANALYSIS

As previously noted, the petitioner alleges that the USPC violated his rights under the *Ex Post Facto* Clause of the United States Constitution by using the 2000 Regulations rather than the 1987 Regulations. In addition, the petitioner also throws out the phrase "bill of attainder." (Doc. 1, p. 2).

1. Bill of Attainder

"Article I, § 9 of the United States Constitution provides that '[n]o Bill of Attainder or ex post facto law shall be passed.'" In re DNA Ex Post Facto Issues, 561 F.3d 294 (4th Cir. 2009). A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." Nixon v. Administrator of Gen. Servs., 433 U.S. 425, 468 (1977).

Liberally construed, the petitioner asserts that the Revitalization Act is a Bill of Attainder. However, the Revitalization Act affects an entire class of persons, D.C. Code offenders, not an "identifiable individual." See Bledsoe v. United States, 384 F.3d 1232 (10th Cir. 2004). In addition, the Act does not inflict any punishment upon the petitioner "beyond maintaining his original sentence." Webb v. Williamson, 2007 WL 1450397 *3 (M.D.Pa. May 16, 2007). Thus, the Revitalization Act is not a Bill of Attainder.

2. Ex Post Facto Clause

The Ex Post Facto Clause "forbids the Congress and the States to enact any law which

imposes a punishment for an act which was not punishable at the time committed; or imposes additional punishment to that then prescribed." Weaver v. Graham, 450 U.S. 24, 28 (1981) (internal quotations omitted). The central concerns of this provision are "the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." Id. at 30. "To fall within the ex post facto prohibition, a law must be retrospective – that is, it must apply to events occurring before its enactment – and it must disadvantage the offender affected by it, by altering the definition of criminal conduct or increasing the punishment for the crime." Lynce v. Mathis, 519 U.S. 433, 441 (1997).

In this particular case, it is clear that all of the crimes for which the petitioner is incarcerated were committed prior to the adoption of the 2000 Regulations. It is equally clear that the USPC utilized the 2000 regulations in 2001, 2004, and 2007, when it denied the petitioner parole. Moreover, it appears that the USPC's actions may have created a significant risk of an increased period of incarceration. When applied to the petitioner's circumstances, the 1987 Regulations indicate that parole "shall be granted."[5] However, even if the petitioner has established an ex post facto violation, the petitioner is not entitled to an order granting him release on parole. At best, he would be entitled to a new parole hearing with instructions to the USPC to apply the 1987 Regulations. Moreover, it is clear that the petitioner has already received this precise relief.

A careful review of the petitioner's latest hearing summary, dated January 14, 2010, establishes that it was conducted pursuant to the 1987 Regulations. The petitioner's Grid Score was 0, which suggested that parole be granted with the Highest Level of Supervision. (Doc. 25-19. p. 4). However, the hearing examiner noted that "[d]ue to the fact that the subject was on parole for an

---

[5]This apparently mandatory language is misleading because the D.C. Board was given discretion to depart from the parole decision suggested by a strict application of the regulations.

Attempted Rape when he committed the instant offense of Rape, this examiner believes the subject must complete the Bureau's Sex Offender Treatment Program before he can be paroled...In compliance with the Sellmon Rule, this examiner also recommends the Commission schedule a Rehearing in 12 months to chart the subject's progress in the Sex Offender Program." (Doc. 25-19, pp. 4-5). The Commission adopted the hearing examiner's recommendations and continued the petitioner to a presumptive parole on January 7, 2013, after the service of an additional 32 months, contingent upon his participation in and completion of the Bureau of Prison's Sex Offender Treatment Program. In deciding to rescind the petitioner's presumptive parole date of May 7, 2010, the Commission stated:

> You have a total point score of 0 under the 1987 Board guidelines for
> D.C. Code offenders. The guidelines indicate that parole should be
> granted at this time. However, a departure from the guidelines at this
> consideration is found warranted because the Commission finds there
> is a reasonable probability that you would not obey the law if released
> and your release would endanger the public safety. You are a more
> serious parole risk than shown by your point score because your need
> for additional programming. Due to the fact that you were on parole
> for an Attempted Rape when you commented the instant offense of
> Rape, the Commission finds that additional programming is needed
> in your case in order for you to remain crime free in the community.

The D.C. Board was given vast discretion to depart from the parole decision suggested by a strict application of the regulations. See 1987 Regs. § 204.22; see also Ellis v. District of Columbia, 84 F.3d 1413, 1418-20 (D.C. Cir. 1986) (holding that the 1987 Regulations do not create a liberty interest for prisoners who are found to be presumptively suitable for parole). "The USPC would have no less discretion when applying the 1987 Regulations; it could faithfully apply the 1987 Regulations to [the] [p]etitioner's parole request and exercise its discretion to deny parole." Taylor v. Craig, No. 05-781, 2009 WL 900048, p. 13 (S.D.W.V. March 24, 2009). Accordingly, "the

12

calculations done under the regulations are intended to 'enable the Board to **exercise its discretion** when, and only when, release is not incompatible with the safety of the community.' §04.3" Ellis, 84 F.3d at 1418 (emphasis in the original). Furthermore, "the regulations explicitly authorize the Board [and by succession, the USPC] to disregard the numerical guidelines simply by referring to 'the specific aggravating or mitigating factors as stated in Appendices 2-1 and 2-1.'§ 204.1" Id. Among the factors listed in the Appendices are "Other" and "Other change in circumstances." App. 2-1, at 2-35; App. 2-2, at 2-38. "Under § 204.22 of the regulations, if the Board [and by succession, the USPC] wished to disregard the results of the scoring system it merely had to say so in writing." McRae v. Hyman, 667 A.2d 1356, 1361 (D.C. 1995).

Here, the USPC chose to disregard the scoring system and deny parole. In doing so, it made a specific finding that there was a reasonable probability that the petitioner would not obey the law if released and posed a more serious parole risk than shown by his point score. In addition, the USPC noted the fact that the petitioner was on parole for an Attempted Rape when he committed the Rape which resulted in his re-confinement. Accordingly, the USPC set forth specific reasons for denying the petitioner his presumptive parole eligibility, and its decision is not subject to review.

As further grounds in support of his petition, the petitioner asserts that the decision by the USPC was racially motivated and violated the Eighth Amendment prohibition against cruel and unusual punishment. Additionally, the petitioner asserts a violation of 42 U.S.C. § 2000a-3.

The petitioner has offered no argument in support of his claim that the Commission's decisions in his case violated due process or equal protection. His bare assertion based on race is insufficient to supply the factual basis needed to support his claim. Additionally, courts have consistently held that denial of parole does not violate the Constitutional prohibition against cruel

and unusual punishment. Franklin v. Reilly, No. 08-82, 2009 WL 86550 *3-4 (N.D.W.V. January 9, 2009) ("because parole proceedings are not part of criminal prosecutions, the actions of the Commission do not constitute punishment...Furthermore, the fact that the Commission denied parole and departed above the guidelines does not establish that the petitioner's Eighth Amendment rights were violated. The Commission has the authority to depart above the guidelines for good cause shown') (citing White v. Hyman, 64 A.2d 1175, 1179 (D.C. 1994)). Finally, 42 U.S.C. § 2000(a) prohibits discrimination or segregation in places of public accommodation, which do not include prisons. Douglas v. U.S. Attorney General, 404 F. Supp. 1314 (WD Okla 1975). Therefore, that statute has no bearing on the petitioner's parole proceedings.

## IV. RECOMMENDATION.

Based on the foregoing, the undersigned recommends that the respondent's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Doc.26) be **GRANTED,** the petitioner's Motion for Evidentiary Hearing (Doc. 36) be **DENIED**, and petitioner's §2241 petition be **DENIED** and **DISMISSED WITH PREJUDICE**

Within fourteen (14) days after being served with a copy of this Recommendation, any party may file with the Clerk of the Court, written objections identifying the portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* petitioner by certified mail, return receipt requested, to his last know address as shown on the docket sheet. The Clerk of the Court is further directed to provide a copy of this Report and Recommendation to all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Filing in the United States District Court.

DATED: December 20, 2010.

    /s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE